### HAMMER v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. March 13, 1918.)

No. 189.

1. SALES ⬤61—CONTRACTS—PASSAGE OF TITLE.
    In case of a controversy as to whether an agreement was a sale, under which title passed, or whether it was only an executory contract, the question is one of intention, to be ascertained from the actions of the parties.

2. POISONS ⬤4—SALE OF NARCOTICS—CONSUMMATION—DELIVERY.
    Where the parties had agreed on all the terms of a sale of narcotic drugs in violation of Harrison Act Dec. 17, 1914, c. 1, 38 Stat. 785 (Comp. St. 1916, §§ 6287g–6287q), and nothing remained to be done, except that at delivery payment should be made, the sale was completed, for, as at common law mutual assent of the parties was sufficient to validate a sale of personalty, title passes where nothing but payment by the buyer remains, though the seller retains possession until payment.

3. CRIMINAL LAW ⬤369(1)—EVIDENCE—OTHER OFFENSES.
    In a prosecution for an unlawful sale of narcotics, in violation of the Harrison Act, which occurred at a point far distant from defendant's residence, evidence that defendant was engaged in the business of dispensing narcotics at his residence is admissible, and not subject to attack as disclosing other offenses; it appearing that defendant was a licensed dealer, and that other consignments of narcotics, save the one furnishing the basis for the prosecution, were lawfully ordered and delivered.

In Error to the District Court of the United States for the Southern District of New York.

Riley C. Hammer was convicted under the Harrison Act of an illegal sale of narcotics, and he brings error. Affirmed.

The indictment was under the Harrison Act (Act Dec. 17, 1914, §§ 1, 2, and 9), and so far as here material charged that Hammer had, within the Southern district of New York, "sold, bartered, and given away" to one Fowle a quantity of the drugs forbidden by the statute; such sale, barter, and giving away having been made "not in pursuance to a written order of the persons to whom" the said drugs were sold, bartered, and given away.

It was shown that Hammer did business in Tampa, Fla., and there conducted a "Medical Institute" frequented by persons described as "dopers and patients that were sick," that he had registered in the proper internal revenue

collector's office in Florida as a dealer in narcotics, that one Rogers, under the name of Gray, was connected with Hammer's business and shipped narcotics, and especially the consignment thereof which gave rise to this indictment, and that one Peak, a drug addict, had, while at Tampa, come to know Hammer's "Institute" and had purchased drugs there.

Peak became an informer, and arranged with Fowle, a revenue agent, the following transaction: He (Peak) communicated with Hammer, asserting that he had a customer in New York for a quantity of drugs, and would act as agent for a commission. Hammer agreed, stating in substance that he could supply what was wanted up to almost any limit. Thereupon Rogers and Hammer, in Tampa, put drugs, of which the sale price was to be $1,750, in a package and sent it by express to Peak in New York C. O. D., and Hammer himself at once started for that city to oversee the matter.

Peak met him at the station, together they went to a hotel, and there Fowle was introduced as the buyer, and with him Hammer discussed drug sales and stated definitely the amount then in the express company's care. Fowle said he wanted that and more, and the three men arranged to meet the next morning, go to the express office, get the drugs, and pay the money. They met accordingly, Hammer and Peak identified themselves as shipper and consignee respectively, Hammer gave Peak a check for the latter's commission, the express clerk was in substance directed to deliver the drug package to Fowle on receiving the money, and Fowle began to count out money, when other agents in waiting stepped up, arrested Hammer, and seized the drugs.

Hammer was convicted, the trial court charging: "If the parties had agreed on all the terms, and nothing remained to be done, except that at delivery the payment should be made, at the time of the delivery, and all that they intended was that Hammer should have a right to withhold the goods until he got the money, if that was the sum and substance of the contract, then the sale was completed when that contract was made. But if you find that they intended, in addition to those terms, that Hammer should have the right, not only to retain possession until payment, but should retain title to the property, then there was no sale until the payment was made."

The assignments of error substantially assert (1) that no sale was made; and (2) it was error to permit the jury to learn of transactions in Tampa, and especially anything of the nature of defendant's business there.

Charles H. Griffiths and Raymond H. Sarfaty, both of New York City, for plaintiff in error.

Francis D. Caffey, U. S. Atty., and John C. Knox, Asst. U. S. Atty., both of New York City.

Before WARD, ROGERS, and HOUGH, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). [1, 2] 1. The contention of plaintiff in error is that there was no actual sale, but merely an agreement to sell. Doubtless there is often difficulty in determining into which category the transaction falls, as was said in the Elgee Cotton Cases, 22 Wall. 187, 22 L. Ed. 863. But there is no doubt that at common law mutual assent of the parties was enough to validate a sale of personalty. If by the agreement the property passed, the "bargain and sale" was complete. It was and is only if the passage of the property (i. e., the title) is to occur in the future, or on conditions inconsistent with immediate transfer, that the contract is executory. Hatch v. Oil Co., 100 U. S. at page 130, 25 L. Ed. 554. And when controversy arises, as here, as to the true character of the agreement, the question is one of intention; the general rule being that the agreement is "just what the parties intended to make it." 100 U. S. 131, 25 L. Ed. 554.

But such intent is to be collected from what the parties did, and in this instance it is to be remembered that we are not concerned with the rights of creditors or other third parties; the inquiry is only whether as between Hammer and Fowle the sale was completed. It is contended that the method of shipment conclusively negatives the intent found by the jury under the instruction quoted above. But, as was held in Simmons v. Swift, 5 B. & C. 857, if the bargain is made, and nothing remains to be done to the goods, though the buyer cannot take them away without paying the price, "property passes immediately," and this was distinctly approved in the Hatch Case, supra, 100 U. S. at page 132, 25 L. Ed. 554.

As the jury were plainly told to decide whether it was intended that Hammer should withhold possession only, or withhold title also, until payment made, we think the instruction exactly right.

[3] 2. The plaintiff in error asserts that, by permitting the nature of Hammer's Tampa business to be shown, the rule laid down by this court in Marshall v. United States, 197 Fed. 513, 117 C. C. A. 65, was violated. The transaction which resulted in a sale in New York began in Tampa; it could not be understood, without a knowledge of what was done there in respect of this particular shipment, and of Peak's relations with the Institute. If such evidence of the whole transaction was injurious to the accused, it was the fault of relevant facts of his own making. The Marshall Case states the impropriety of proving "offenses" other than the one charged in the indictment, and confines the ruling to the "facts in the case in hand." We discover no proof of other offenses. Hammer was licensed, and Rogers was a doctor; non constat that what Rogers distributed (other than the present consignment) was lawfully ordered and delivered.

Judgment affirmed.