## KING et al. v. ADAMS et al.

(Circuit Court of Appeals, Eighth Circuit. March 19, 1920.)

No. 5415.

1. Sales 199—Ordinarily title passes when agreement is made.

Generally title passes in a bargain and sale at the time the agreement is struck.

2. Sales 202(8)—On cash sale title passes on payment, unless that is waived.

On a sale for cash, title as a rule will not pass until payment; but, if the goods are delivered without requiring payment, it is presumed, in the absence of an agreement to the contrary, that the prepayment of the price was waived, and the title passes on delivery.

3. Sales 199—Title held to pass, notwithstanding mistake resulting in underpayment.

Where 50 bales of cotton were sold for cash, but, by a mistake in adding the weights of the bales, payment was made for 1,000 pounds less than was actually delivered, the seller's intention was clear to pass title to the cotton, and his only remedy is to recover on the contract for the unpaid portion of the purchase price, so that he cannot bring an action for conversion, and recover as damages the highest market value of the unpaid for cotton since the sale.

In Error to the District Court of the United States for the Western District of Oklahoma; Joseph W. Woodrough, Judge.

Action by P. H. Adams and others, a copartnership doing business under the firm name and style of P. H. Adams & Co., against S. W. King and others, a copartnership doing business under the firm name and style of King, Collie & Co. Judgment for plaintiffs, and defendants bring error. Reversed.

John Embry, of Oklahoma City, Okl. (Embry, Johnson & Kidd, of Oklahoma City, Okl., and Murphy W. Townsend, of Dallas, Tex., on the brief), for plaintiffs in error.

Mark Goode, of Shawnee, Okl., for defendants in error.

Before SANBORN, Circuit Judge, and LEWIS and MUNGER, District Judges.

LEWIS, District Judge. Both P. H. Adams & Co. (called Adams), a co-partnership of Shawnee, Oklahoma, and King, Collie & Co. (called

King), a co-partnership of Dallas, Texas, bought and sold cotton. They had dealt with each other. The particular purchase of 50 bales by King from Adams, made in October, 1916, at Shawnee, through King's agent, was carried on this way: The agent went to Adams' office, where samples from the bales at the compress were produced for grading, and duplicate sheets made out at the compress, showing weight of each bale and press tag number of each bale, were brought in; but the columns of weights on the two sheets had not been footed. The agent, in the presence of Adams, added up the columns on one sheet and by mistake put down the total weight as 15,541 lbs., whereas it should have been 25,541 lbs. The error was unintentional. The record is silent of either expressly assuming an obligation or duty to figure up the total purchase price. Presumptively, that was the privilege of each. Adams was content to leave it wholly to King's agent. Each of them was quite familiar with the fact that the average weight of a bale of botton is 500 lbs., and responsibility for the error is attributable to both, though not in equal degree. Accepting the erroneous footing the purchase price was figured by the agent at the agreed rate per lb., the agent drew a draft on King for the amount so ascertained, delivered it to Adams, the cotton went forward and was received at Dallas by King in a few days. The draft, with invoice attached showing weights, was paid in due course.

King's bookkeeper, on entering the transaction, discovered the error in weight and entered a credit of $1,638.25 to Adams, being the amount for the 10,000 lbs. at the agreed purchase price. The error was first called to King's personal attention some two months later. The matter rested for fourteen months, when Adams, on having his books audited, was first advised of the error. He at once went to Dallas, taking with him a duplicate of the compress weights on which a balance due of $1,638.25 for the 10,000 lbs. had been figured, exhibited the sheet to King, and demanded payment of King of that amount. In the conversation King told Adams he knew all about the error of 10,000 lbs., and had withheld the $1,638.25 for adjustment in settlement of a judgment he had obtained against Adams then pending on appeal in the Oklahoma Supreme Court, and that he would not pay the $1,638.25 then unless the judgment was deducted. Adams declined to make the deduction, returned to Oklahoma and brought this action against King. He charged fraud and deception in the purchase, and preconceived design to cheat him out of the 10,000 lbs., cast his declaration as trover for conversion, and asked as damages the highest market price under a local statute which reads:

"The detriment caused by the wrongful conversion of personal property is presumed to be: * * * Second. Where the action has been prosecuted with reasonable diligence, the highest market value of the property at any time between the conversion and the verdict."

The answer was a general denial and tender of $1,638.25 as balance of purchase price. The action cannot be sustained unless title to the 10,000 lbs., was in Adams at the time he sued.

The court found there was no fraud, with which we agree; but further found that the 10,000 lbs. were not obtained through con-

tract, with which we do not agree. And then refused defendant's request for an instructed verdict of $1,638.25 and instructed a verdict of $3,550.00, the highest market price, in accordance with the statute. This was error. The sale and purchase was 50 bales at an agreed price per pound, and it is very clear that Adams delivered and King received the 50 bales in execution of that agreement. It was the intention that payment was to be made on delivery, and both parties thought it was being made, but through error only part was paid down. The mistake only entered into the execution of the agreement. It did not touch the terms of the bargain and sale. The sale was of 50 specified bales at an agreed price per pound. Adams at once delivered the thing sold and King attempted to pay the full purchase price, but the mistake caused a shortage in that payment of $1,638.25.

[1, 2] It is the general rule that title passes in a bargain and sale at the time the agreement is struck. Hatch v. Oil Co., 100 U. S. 124, 25 L. Ed. 554. But it is also a rule in Oklahoma, where the agreement was made and the property situate, as elsewhere, that on a sale for cash, title will not pass until payment. This is the basis of Adams' contention and the foundation of his action. Notwithstanding this principle, if it was the intention of the parties at the time of the transaction that title should then pass to the buyer it at once vested in him, though none of the purchase price was paid. Tiedeman on Sales says, at Sec. 83:

"The primary factor in the determination of the transfer of title is in the intention of the parties. This intention may be expressed or it may be implied from the surrounding circumstances and the condition of the goods."

Furthermore, prepayment may be waived, and unconditional delivery is strong evidence of waiver and release of the seller's right to claim any interest in or return of the goods. Tiedeman says, at Sec. 85:

"Where the sale is a cash transaction, the parties are presumed to require prepayment of the price before there is to be any transfer of title or possession. If the goods are delivered to the vendee, in the absence of an express agreement to the contrary, the prepayment of price is presumed to have been waived, and the vendee acquires title on delivery."

Williston on Sales, Sec. 346, says:

"A delivery to the buyer with authority to use the goods immediately should be conclusive evidence of transfer of the property, in the absence of pretty clear evidence showing an intention to reserve the title."

See also 1 Benjamin on Sales, Sec. 335 et seq.; 35 Cyc. 327.

[3] The intention must be gathered from the testimony, the facts and circumstances surrounding the transaction; and from these we are unable to find anything that would support an inference that Adams did not intend to pass title to the 50 bales, but on the contrary we are convinced that it was then his intention to vest in King unconditional ownership. He believed that King was making payment in full, and with that in mind he could not have had any other intention. His mistaken assumption, in the absence of fraud, in no manner affects or nullifies the intention and purpose which he entertained at the time he made delivery. He knew that King bought and sold cot-

ton, and that these bales would be put upon the market. His subsequent demand for the balance of the purchase price confirms this conclusion. His remedy is on the contract.

Reversed.